UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANDRE GLADNEY,

               Plaintiff,

       v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

             Defendant.

_____

DECISION & ORDER

12-CV-6423P

## PRELIMINARY STATEMENT

Plaintiff Andre Gladney ("Gladney") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 12).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 7, 8). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards.

_____

[1] After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Gladney's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.     Procedural Background

Gladney applied for DIB on January 21, 2009 and for SSI on February 17, 2009, alleging he had been disabled since June 29, 2007 due to exostosis right talus and arthritis in his hands.  (Tr. 119, 127, 153).[2]  On March 31, 2009, the Social Security Administration denied both of Gladney's claims for benefits, finding that he was not disabled.  (Tr. 59-60).  Gladney requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 69-70, 80-84).  The ALJ conducted a hearing in Rochester, New York on April 19, 2010.  (Tr. 24-58).  Gladney was represented at the hearing by his attorney, Gregory Fassler, Esq. (Tr. 24, 67).  In a decision dated July 19, 2010, the ALJ found that Gladney was not disabled and was not entitled to benefits.  (Tr. 11-19).

On June 15, 2012, the Appeals Council denied Gladney's request for review of the ALJ's decision.  (Tr. 1-5).  Gladney commenced this action on October 8, 2012 seeking review of the Commissioner's decision.  (Docket # 1).

Gladney filed a subsequent application for disability benefits that was granted. (Docket # 8-1 at 3).  According to Gladney, the Commissioner found him disabled beginning on July 20, 2010, the day after the ALJ's decision.  (*Id.*).  Accordingly, the relevant period under consideration for this appeal is June 29, 2007 until July 19, 2010.

---

[2]  The administrative transcript shall be referred to as "Tr. __."

II.   **Non-Medical Evidence**

   A.   **Gladney's Applications for Benefits**

   Gladney was born on December 22, 1976 and is now thirty-seven years old.  (Tr. 149).  Gladney graduated from high school in 1996.  (Tr. 158).  Gladney's previous work history includes employment as a maintenance employee, mail room clerk, and food-packing clerk.  (Tr. 171-76).  During the summer after he graduated from high school, Gladney performed maintenance activities for the City of Rochester Water Bureau.  (Tr. 171, 203).  Gladney was next employed by a temporary staffing agency and performed mail-sorting activities.  (Tr. 173).  From 1998 through July 29, 2008, Gladney was employed by Wegmans.  (Tr. 120, 173).

   At Wegmans, Gladney worked primarily in the meat department of the warehouse packaging fresh meat products for retail sale.  (Tr. 31-32, 154-55).  According to Gladney, he was an assistant team leader and responsible for supervising approximately ten employees.  (*Id.*).  Gladney reported that the job required him to lift rolls of wrapping paper weighing approximately fifty pounds.  (Tr. 33, 154-55).  In May 2007, Gladney was transferred to the bakery department where he was responsible for carrying trays of baked goods during the production process and packaging the finished bakery products.  (Tr. 29-30, 154-55).  According to Gladney, the trays weighed as much as seventeen pounds.  (Tr. 31).  Gladney reported that he left Wegmans in June 2007 for medical reasons, returned on a part-time basis in February 2008, but experienced a number of medical-related absences that ultimately caused him to cease working in July 2008.  (Tr. 37-38, 120, 153).  According to Gladney, his ankle condition, which limits his ability to stand or walk, caused him to stop working.  (Tr. 153).  He has not worked since July 2008.  (*Id.*).

3

When Gladney applied for disability benefits, he lived with his mother.  (Tr. 160).

Gladney reported that his daily activities included caring for his personal hygiene and caring for

his mother, who is disabled.  (Tr. 161).  According to Gladney, he is able to complete personal

hygiene tasks without assistance, can perform household chores including sweeping, mopping

and laundry and can prepare meals.  (Tr. 161-62).  Gladney reports that he is able to shop for

groceries and is able to manage his own finances.  (Tr. 164).  Gladney's hobbies and activities

include watching television, spending time with his family, talking on the telephone, visiting

friends and using the computer.  (Tr. 164-65).

According to Gladney, he has difficulty standing for periods of time and needs to

hold on to something in order to climb stairs, squat or kneel.  (Tr. 165).  Gladney can walk

approximately one block before needing to rest for a few minutes.  (Tr. 166).  In addition,

Gladney reports that his hands ache and cramp when he lifts heavy objects.  (Tr. 165).  Gladney

experiences pain in his hands and ankle.  (Tr. 166).  Gladney describes his pain as a constant

ache that is not as severe as it used to be.  (Tr. 168-69).  Gladney manages his pain through

soaking, resting and icing and uses Tylenol, which reduces the pain within ten minutes of

ingestion.  (*Id.*).

**B.**     **The Disability Analyst's Assessment**

On March 31, 2009, disability analyst M. Smith ("Smith") completed a Physical

Residual Functional Capacity Assessment.  (Tr. 310-15).  Smith opined that Gladney could

occasionally lift ten pounds and frequently lift less than ten pounds.  (Tr. 311).  According to

Smith, Gladney could stand or walk for at least two hours during an eight-hour workday and

could sit for at least six hours in an eight-hour workday.  (*Id.*).  According to Smith, Gladney had

4

no limitations on his ability to push or pull.  (*Id.*).  In addition, Smith opined that Gladney could

occasionally climb ladders, ropes or scaffolds, balance, stoop, kneel, crouch and crawl.  (Tr.

312).  Smith opined that Gladney did not have any further physical limitations.  (Tr. 312-13).


## III.   Medical Evidence

### A.   Treatment Records

On July 17, 2000, Gladney began receiving primary care treatment with Faisal

Shamsie, M.D. ("Shamsie").  (Tr. 350).  During the initial appointment, Shamsie noted that

Gladney was obese, advised Gladney to continue to diet and exercise, and scheduled Gladney for

a physical examination.  (*Id.*).  On September 18, 2000, Gladney returned to Shamsie for a

physical examination.  (Tr. 351).  Gladney reported that he had injured his hand at work but that

the swelling in his hand had resolved.  (*Id.*).  Upon examination, Shamsie noted that Gladney had

flat feet and referred him to Strong for orthopeadic inserts.  (*Id.*).

The record does not reflect that Gladney had any additional appointments with

Shamsie until June 2, 2003, when he met with Shamsie complaining of pain in his hands.  (Tr.

346).  Shamsie recommended testing to rule out any autoimmune disorders, Raynaud's or

rheumatoid arthritis.  (*Id.*).  Shamsie also recommended a blood test to assess Gladney's

cholesterol level and that Gladney consult a dietician, decrease his calorie intake and lose weight;

Gladney declined to consult a dietician.  (*Id.*).  Treatment records suggest that Gladney was

ultimately diagnosed with arthritis.  (Tr. 338).

Shamsie referred Gladney to Altezaz Ahmed, M.D., F.A.C.R., ("Ahmed") for a

rheumatology evaluation.  (Tr. 326).  On July 10, 2003, Ahmed diagnosed Gladney with

Raynaud's phenomenon. (*Id.*). Ahmed opined that the symptoms are likely exacerbated by Gladney's occupational exposure to a cold environment and his continued smoking. (*Id.*). According to Ahmed, although testing revealed that Gladney was positive for ANA, he showed no signs of systemic connective tissue disease. (*Id.*). Ahmed prescribed Procardia and recommended a follow-up visit in one month. (*Id.*).

On August 13, 2003, Gladney returned for a follow-up appointment with Ahmed. (Tr. 328). According to Gladney, he was feeling much better and reported that his circulatory symptoms had improved since he began taking Procardia. (*Id.*). Ahmed assessed that the Raynaud's phenomenon had improved and noted that Gladney continued to test positive for ANA. (*Id.*). Ahmed opined that presence of ANA suggested that Gladney could suffer from systemic connective tissue disease in the future. (*Id.*). Ahmed recommended a follow-up visit in three months. (*Id.*).

On November 11, 2003, Gladney attended a follow-up appointment with Ahmed. (Tr. 327). Gladney reported that his circulatory symptoms were stable. (*Id.*). Again, Ahmed assessed that the Raynaud's phenomenon had improved, but that the presence of ANA suggested that Gladney could suffer from systemic connective tissue disease in the future. (*Id.*). Accordingly, Ahmed recommended a follow-up appointment in four months. (*Id.*).

Gladney's next appointment with Ahmed was not until January 26, 2005. (Tr. 329). During the appointment, Gladney complained of right ankle pain that he had experienced over the previous eight months. (*Id.*). Gladney reported that the pain was precipitated by inactivity and was relieved by walking or standing. (*Id.*). Gladney also reported that he had discontinued the Procardia and was experiencing color changes in his fingers when his hands

6

were exposed to cold temperatures.  (*Id.*).  Ahmed assessed that Gladney continued to have

recurrent symptoms from the Raynaud's phenomenon and that the ankle pain was caused by

ankle deformities and pes planus (flat feet).  (*Id.*).  Ahmed prescribed Procardia and Naprosyn,

ordered laboratory work and recommended that Gladney return for a follow-up in three months.

(*Id.*).

On February 2, 2005, Gladney's right ankle pain was evaluated by Bhaskar

Bhattacharyya, D.P.M., M.S., ("Bhattacharyya"), a podiatrist, after a referral from Shamsie.  (Tr.

358).  Bhattacharyya noted that Gladney had suffered from rheumatoid arthritis for the past year.

(*Id.*).  After reviewing x-rays, which showed talar beaking on the head of the ankle joint,

Bhattacharyya recommended that Gladney return in one month to be fitted for orthotics.  (*Id.*).  In

the meanwhile, Bhattacharyya recommended that Gladney use an over-the-counter insert.  (*Id.*).

Gladney's next medical appointment reflected in the treatment records was with

Shamsie on June 11, 2007.  (Tr. 256).  Gladney reported suffering from right ankle pain and

swelling for the previous three weeks.  (*Id.*).  Shamsie recommended x-rays and that Gladney

take Aleve to manage the pain and return for a follow-up appointment in ten days.  (*Id.*).

On June 22, 2007, Gladney attended a follow-up appointment with Shamsie.  (Tr.

255).  Shamsie noted that the x-ray revealed a heel spur and that Gladney reported continued

pain, especially when walking.  (*Id.*).  Shamsie referred Gladney to a podiatrist.  (*Id.*).

On September 20, 2007, Gladney was scheduled for surgery to remove a bone

spur from his right foot.  (Tr. 215, 233).  During his preoperative examination, Gladney reported

that he had been suffering from pain in his right ankle for approximately two years.  (Tr. 233).

Initially, x-rays revealed arthritis and Gladney reported that he was treated by a podiatrist and

7

underwent cortisone injections without relief.  (*Id.*).  According to Gladney, he used orthotics

without relief and his pain was aggravated by physical activity.  (*Id.*).  Michael L. Giordano,

D.P.M., ("Giordano") performed the surgery.  (Tr. 215).  The surgery was successful in removing

the spur and at discharge Gladney's prognosis was very good.  (*Id.*).

On July 31, 2008, Gladney was scheduled for surgery to remove scar tissue that

had formed as a result of his prior surgery.  (Tr. 264, 282).  Prior to his surgery, Gladney reported

that despite using non-narcotic pain medications and orthotics, he continued to experience

discomfort in his right ankle after his previous surgery.  (Tr. 282).  Once again, the surgery was

performed by Giordano.  (Tr. 264).  Following the surgery, Giordano opined that Gladney's

prognosis was "very good."  (*Id.*).  On September 17, 2008, Giordano wrote a letter indicating

that Gladney suffered from degenerative arthritis in his right, mid-foot and a large exostosis

(bone spur) on the same foot.  (Tr. 306).  Giordano noted that Gladney had undergone two

surgeries to his right foot and opined, at the time, that Gladney's long-term prognosis was

impossible to predict.  (*Id.*).

On March 18, 2009, state examiner Dr. George Alexis Sirotenko, D.O.,

("Sirotenko") conducted a consultative orthopedic examination of Gladney.  (Tr. 307-09).

Gladney reported that he continued to suffer persistent pain in his right ankle that was aggravated

by standing, walking or climbing stairs for more than thirty minutes.  (Tr. 307).  Gladney

reported using Tylenol Arthritis to manage his pain.  (*Id.*).  Gladney told Sirotenko that he could

perform his own personal hygiene, as well as light cooking, cleaning, laundry and shopping.

(*Id.*).  Gladney's activities included watching television, listening to the radio, reading and

socializing with friends.  (*Id.*).  At the time of the examination, Gladney was approximately six

feet, two inches tall and weighed 350 pounds.  (Tr. 308).  Sirotenko noted that Gladney had an

antalgic gait on the right side, could squat to 75% and had difficulty walking on his right heel and

toe.  (*Id.*).  In addition, Sirotenko noted that Gladney used no assistive devices, did not need any

assistance changing for the exam or getting on or off of the exam table and was able to rise from

the chair without difficulty.  (*Id.*).  Sirotenko further noted that Gladney's hand and finger

dexterity were intact and that his grip strength was 5/5 bilaterally.  (*Id.*).  Sirotenko opined that

Gladney had "moderate limitation regarding prolonged standing, walking, stairs, inclines or

ladders or operating foot pedals with his right foot."  (*Id.*).  In addition, Sirotenko opined that

Gladney might have some difficulty with repetitive kneeling, squatting or bending due to his

morbid obesity.  (*Id.*).  According to Sirotenko, Gladney did not need an assistive or supportive

device.  (*Id.*).

On March 5, 2010, Giordano completed a Physical Assessment for Determination

of Employability form.  (Tr. 364-67).  On the form, Giordano noted that he had last examined

Gladney on November 4, 2009 and that Gladney had a history of degenerative arthritis and scar

tissue on his right foot.  (Tr. 364-65).  Giordano opined that Gladney suffered from abnormalities

in his gait, heel and toe walking and his extremities.  (Tr. 366-67).  Giordano opined that

Gladney had limitations in his ability to walk, stand, push, pull or bend for more than one to two

hours in an eight-hour workday.  (Tr. 367).

## IV.   <u>Proceedings before the ALJ</u>

At the administrative hearing, Gladney testified that he was last employed by

Wegmans and had worked in its warehouse in both the bakery and meat departments.  (Tr. 29).

In the bakery, Gladney loaded pans filled with baked goods onto conveyor belts, packaging the goods and stacking them for shipment. (Tr. 29-30). According to Gladney, the trays could weigh up to seventeen pounds. (Tr. 30). Gladney worked in the bakery department for approximately two months beginning in May 2007. (Tr. 31). Prior to that time, he worked in the freezer of the meat department. (*Id.*). In that department, Gladney held a supervisory role, but also engaged in manual labor packaging meat products for distribution. (Tr. 32). According to Gladney, the meat department position required him to lift fifty-pound rolls of plastic wrap. (Tr. 33). Gladney worked in this role between 1998 and May 2007 when the department closed and he was moved to the bakery. (*Id.*). Prior to Wegmans, Gladney interned for the City of Rochester Water Bureau and worked various jobs for a temporary employment agency. (Tr. 33-34).

Gladney testified that he lives with his mother and that he graduated from high school in 1996. (Tr. 34-35). In high school, Gladney attended regular class settings. (*Id.*). According to Gladney, he stopped working after he underwent two surgeries on his foot within an approximate ten-month period. (Tr. 28, 35, 37-38). According to Gladney, after his first surgery in September 2007, he returned to work on a part-time basis, working approximately four hours per day. (Tr. 37-38). After his second surgery, according to Gladney, he was terminated from his position at Wegmans because of his medical issues. (Tr. 38). Gladney testified that he has not looked for any other employment because he is continuing to recuperate from his surgery and his ankle continues to swell every day. (Tr. 38-39).

Gladney testified that he continues to have trouble with his foot and also has been diagnosed with Raynaud's phenomenon in his hands. (Tr. 35). According to Gladney, his ankle

swells every day, which he treats by soaking in a mixture of hot water, Epsom salts, green alcohol, peroxide and Dr. Fred's Arthritis Sports Liquid.  (Tr. 39).  Gladney testified that although he has experienced some improvement since his last surgery, his ankle continues to ache constantly.  (Tr. 39-40).  According to Gladney, he continues to do ankle exercises that he learned during physical therapy sessions that he attended after his first surgery.  (Tr. 40).  Gladney testified that he walks with a limp and cannot sit or stand for long periods of time.  (Tr. 43-44).  According to Gladney, he can only lift ten pounds, stand for a few minutes at a time before needing a break, and can sit for up to thirty minutes before needing to change position.  (Tr. 49-50).  Gladney does not take any prescription medications to manage his pain and uses over-the-counter Tylenol Arthritis, which effectively calms his pain but does not reduce his swelling.  (Tr. 41).  During the day, according to Gladney, he elevates his leg to alleviate the pain and swelling.  (Tr. 45).

Regarding his Raynaud's phenomenon, Gladney testified that he experiences pain in his hands and wrists when performing tasks such as writing or typing.  (Tr. 41-42).  According to Gladney he can typically perform such tasks for approximately five minutes before needing an approximately twenty-minute break.  (Tr. 42-43).  Gladney testified that he experiences pain in both his hands and his ankle when he carries heavy objects, such as his mother's groceries or cases of water.  (Tr. 43).  Further, according to Gladney, his fingers and joints can become painful, making it difficult for him to hold objects.  (*Id.*).

Gladney testified that during a typical day he will walk around, perform exercises on his ankle and assist his mother with chores.  (Tr. 46).  On bad days when he experiences

significant pain, Gladney avoids activity and attempts to alleviate the pain. (Tr. 46-47).

According to Gladney, every day is not a bad day and some days he feels "pretty good." (Tr. 47).

The ALJ also heard testimony from a vocational expert, Peter Manzi ("Manzi"),

regarding jobs available for an individual with Gladney's capabilities. (Tr. 51-58). The ALJ

asked Manzi to make three separate sets of assumptions. (Tr. 53-55). First, he asked Manzi to

assume the individual could perform the full range of light work, but is limited to walking no

more than one hour total and is limited to frequent (as opposed to constant) handling and

fingering. (Tr. 53-54). Under those limitations, Manzi testified, an individual would not be able

to perform Gladney's past work. (Tr. 54). However, such an individual could perform other

regional and national jobs, including the positions of collator operator and laundry sorter. (*Id.*).

Second, the ALJ asked Manzi to assume the individual could perform the full

range of sedentary work, but was unskilled and limited to walking no more than one hour total

and to frequent (as opposed to constant) handling and fingering. (*Id.*). According to Manzi, with

those limitations, an individual could perform the positions of addresser and telephone quotation

clerk. (*Id.*). Finally, the ALJ asked Manzi to assume the same limitations as the second

hypothetical and also to assume that the individual must lie down or otherwise be unavailable for

two hours of each eight-hour work shift. (Tr. 55). Manzi testified that there were no unskilled

positions which someone with such limitations could perform. (*Id.*).

Gladney's attorney asked Manzi whether his answer to the second hypothetical

would change if the individual was "also limited to standing one hour total in an eight-hour day."

(*Id.*). Manzi responded, "No, the total of standing and walking is two hours [and] that fits with

the DOT's definition of sedentary." (*Id.*). The attorney also asked whether Manzi's answer to

the second hypothetical would change if the individual was limited to occasional (as opposed to frequent) handling and fingering.  (Tr. 55-56).  Manzi responded that such an individual would not be able to perform the previously-identified positions, but would be able to perform the positions of call out operator and surveillance system monitor.  (Tr. 55-57).  The attorney asked whether Manzi's answer would change if the individual also needed to change position every twenty minutes.  (Tr. 56).  Manzi indicated that such a limitation would not affect his answer. (Tr. 56-57).  Finally, the attorney asked whether an additional limitation of being off task every ten minutes would alter Manzi's answer.  (Tr. 57).  Manzi indicated that with that additional limitation there would be no available jobs in the national or regional economy that the individual could perform.  (*Id.*).

## DISCUSSION

## I.    Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal

standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district

court reviewing the Commissioner's determination to deny disability benefits is directed to

accept the Commissioner's findings of fact unless they are not supported by "substantial

evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if

supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as

"more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal

quotation omitted).

      To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight."  *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v.

Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

      A person is disabled for the purposes of SSI and disability benefits if they are

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ

must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982) (*per curiam*).  The five-steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

    A.    **The ALJ's Decision**

        In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 11-19).  Under step one of the process, the ALJ found that Gladney had

not engaged in substantial gainful activity since June 29, 2007, the alleged onset date.  (Tr. 16).

At step two, the ALJ concluded that Gladney has the severe impairments of exostosis, arthritis

right talus, obesity and Raynaud's syndrome.  (*Id.*).  At step three, the ALJ determined that

Gladney does not have an impairment (or combination of impairments) that meets or medically

equals one of the listed impairments.  (Tr. 17).  At step four, the ALJ concluded that Gladney has

the residual functional capacity ("RFC") to perform sedentary work except that he is limited to

frequent fingering and handling and can only walk for one hour total in an eight-hour workday.

(Tr. 18).  Finally, the ALJ determined that Gladney was unable to perform past work, but that –

considering his age, education, work experience, and RFC – jobs existed in significant numbers

in the national economy that Gladney could perform.  (Tr. 18-19).  Accordingly, the ALJ found

that Gladney is not disabled.  (*Id.*).

### B.   Gladney's Contentions

Gladney contends that the ALJ's determination that he is not disabled is not

supported by substantial evidence.  (Docket # 8).  First, Gladney maintains that the ALJ's RFC

determination is not supported by substantial evidence because the ALJ failed to assess

Gladney's limitations attributable to Raynaud's phenomenon.  (*Id.* at 7-8).  Further, Gladney

contends that the ALJ should have contacted Ahmed to obtain his opinion regarding Gladney's

Raynaud's condition.  (*Id.*).  In addition, Gladney maintains that the ALJ erred at step five

because he misstated the vocational expert's testimony and because the vocational expert's

testimony cannot otherwise provide substantial evidence in support of the ALJ's conclusion.  (*Id.*

at 8-10).  Finally, Gladney contends that the ALJ failed to apply the appropriate legal standards

when assessing Gladney's credibility.  (*Id.* at 10-11).

II.     **Analysis**

A.     **RFC Assessment**

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

Gladney challenges the ALJ's RFC determination on the grounds that it failed to account for his physical limitations associated with his Raynaud's phenomenon.  Gladney argues that the ALJ overlooked the symptoms of pain he experiences when writing, typing or resting his hands on hard surfaces.  (Docket # 8-1 at 8).  Gladney further contends that the ALJ failed to articulate why he found Gladney capable of frequent fingering and handling.  (*Id.*).

I disagree that the ALJ failed to address Gladney's Raynaud phenomenon in his determination.  At step two, the ALJ specifically determined that the Raynaud's phenomenon was a "severe" impairment.  I agree with Gladney that the ALJ failed to fully articulate his rationale for determining that Gladney was capable of frequent fingering or handling; however, I

conclude that this failure was harmless because the ALJ's rationale can be ascertained from his decision and the record otherwise provides substantial evidence for the ALJ's determination. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale in relation to evidence in the record, we would not remand where we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence") (internal quotations omitted); *Desmond v. Astrue*, 2012 WL 6648625, *6 (N.D.N.Y. 2012) ("the ALJ's rationale can be gleaned from her decision and the RFC determination is, ultimately, supported by substantial evidence. . . . this [c]ourt's decision should not be read as diminishing the importance of the ALJ's obligation to provide a function-by-function assessment[;] [h]owever, in this particular case, that error is found to be harmless").

In rendering his RFC determination, the ALJ noted that he considered all of Gladney's symptoms, the objective medical evidence, and other evidence, including the medical opinion evidence, in accordance with the regulations.  (Tr. 17).  After carefully considering the evidence, the ALJ concluded that Gladney did suffer from impairments that could cause all of his alleged symptoms, but that the objective medical evidence – specifically Giordano's and Sirotenko's opinions and the treatment records from Shamsie and Bhattacharyya – contradicted Gladney's testimony that the symptoms he suffers were sufficient to cause him to be disabled. (Tr. 18).

Gladney challenges the ALJ's conclusion that he is capable of frequent handling and fingering; however, I agree with the ALJ that the evidence in the record does not support a

finding of greater handling or fingering limitations.  The record establishes that Ahmed first

diagnosed and treated Gladney's Raynaud's phenomenon in July 2003.  (Tr. 326).  Ahmed

prescribed medication to control the symptoms, and by August 2003 Ahmed determined that

Gladney's condition and symptoms had improved.  (Tr. 328).  Although it appears that Gladney

returned to Ahmed in 2005 and reported symptoms related to his Raynaud's condition, Ahmed

noted that he had not examined Gladney in many months and that Gladney had been

non-compliant with prescribed medication.  (Tr. 329).  Nothing in the record suggests that

Gladney sought treatment for Raynaud's phenomenon-related symptoms after January 2005.

Further, during the consultative examination, Sirotenko noted that Gladney's hand and finger

dexterity were intact, that his grip strength was 5/5 bilaterally and that he had full range of

motion in his wrists.  (Tr. 308).  Accordingly, although the ALJ could have more fully articulated

the basis for his conclusion that Gladney was capable of frequent handling or fingering, I

conclude that his failure to do so is harmless because the RFC assessment is supported by

substantial evidence in the record.  *See Mongeur v. Heckler*, 722 F.2d at 1040 ("[g]iven the

ALJ's statement that he had considered all of the evidence presented, and given the clear

evidence in the record that [claimant] had never mentioned the alleged fainting spells to any of

his doctors or nurses, we consider a remand unnecessary"); *Desmond v. Astrue*, 2012 WL

6648625 at *6.

      Gladney also contends that the ALJ erred by failing to contact Ahmed, who last

treated Gladney two years prior to the alleged onset date, to seek his opinion as to the impact, if

any, of the Raynaud's phenomenon on Gladney's ability to meet the physical demands of work.

"It is well established in the Second Circuit that an ALJ is under an obligation to develop the

administrative record fully, to ensure that there are no inconsistencies in the record that require

further inquiry, and to obtain the reports of treating physicians and elicit the appropriate

testimony during the proceeding." *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013).

The regulations provide that the administration "'*will* request a medical source statement'

containing an opinion regarding the claimant's residual capacity." *Tankisi v. Comm'r of Soc.*

*Sec.*, 2013 WL 1296489, *4 (2d Cir. 2013) (summary order) (quoting 20 C.F.R.

§§ 404.1513(b)(6), 416.913(b)(6)).   The fact that a claimant is represented during the

administrative hearing does not relieve the ALJ of his duty to develop the record.  *See id.* at *4

n.1. ("counsel's responsibilities do not derogate from the ALJ's responsibility to investigate").

   Although nothing in the record indicates that the ALJ attempted to obtain a

functional assessment from Ahmed, his failure to request such an assessment does not mandate

remand.  *See id.* ("we hold that it would be inappropriate to remand solely on the ground that the

ALJ failed to request medical opinions in assessing residual functional capacity"); *see also*

*Kunkel v. Comm'r of Soc. Sec.*, 2013 WL 4495008, *16 (W.D.N.Y. 2013) ("quite recently, a

panel of the Second Circuit Court of Appeals rejected the idea that an ALJ's failure in his duty to

request an RFC assessment from a treating physician necessarily or automatically requires a

remand").  Instead, the relevant inquiry is whether, in the absence of the assessment, the record

was sufficient to support the ALJ's RFC assessment.  *Id.* ("the issue is whether the record was

adequate to permit the ALJ to determine whether or not [p]laintiff was disabled").  As an initial

matter, it is unclear whether and if so, to what extent, Ahmed's opinion would have assisted the

ALJ in his determination.  Ahmed last treated Gladney in January 2005, approximately two and

one-half years prior to the alleged disability onset date.  (Tr. 329).  During his last visit with

Ahmed, Gladney reported non-compliance with prescribed treatment.  (*Id.*).  Further, in the interim, and despite the alleged impairments caused by his Raynaud's condition, Gladney continued to work until July 2008.  In any event, as discussed above, I conclude that the record was adequate to support the ALJ's RFC determination.

 **B.**  **Vocational Expert Testimony**

   Gladney challenges the ALJ's reliance upon the testimony of the vocational expert, Manzi, on three separate grounds.  First, Gladney contends that the ALJ misstated Manzi's testimony in his decision.  Second, Gladney contends that Manzi's answer to a question posed by Gladney's attorney suggests that Manzi may have been confused about the hypothetical posed by the ALJ.  Finally, Gladney contends that Manzi's testimony cannot support the ALJ's determination at step five because it was based upon a flawed RFC.  Each of these challenges are addressed below.

   In his decision, the ALJ concluded that Gladney had the capacity to perform sedentary work, but could only frequently finger or handle objects and could walk no more than one hour during an eight-hour workday.  (Tr. 17).  At step five, relying in part on Manzi's testimony, the ALJ concluded that Gladney could perform the requirements of the occupations of collator operator and laundry sorter, both which existed in sufficient numbers in the national and regional economy.  (Tr. 19).  Gladney contends, and the government concedes (Docket # 10 at 5), that the ALJ erred when he included these occupations in his determination because these occupations require an individual to perform light (as opposed to sedentary) work.  Although the ALJ mistakenly included these occupations, I conclude that his error was harmless because Manzi also provided testimony that a person with Gladney's RFC could perform the

requirements of the occupations of addresser and telephone quotation clerk, both of which are

classified as sedentary positions.  (Tr. 54).  According to Manzi, there are approximately 25,042

addresser positions in the national economy and 223 in the regional economy.[3]  (*Id.*).  Further,

Manzi testified that there are approximately 85,138 telephone quotation clerk positions in the

national economy and 408 in the regional economy.  (*Id.*).  Accordingly, I conclude that the fact

that the ALJ mistakenly cited to the wrong positions does not undermine my conclusion that

substantial evidence supports the ALJ conclusion at step five.  *See Fox v. Comm'r of Soc. Sec.*,

2009 WL 367628, *18, 20 (E.D.N.Y. 2009) (testimony from vocational expert that individual

could perform requirements of surveillance systems monitor with 132,980 jobs nationally and

200 jobs regionally established significant number of jobs; ALJ properly relied upon the

testimony when concluding that work existed in the national and regional economy that plaintiff

could perform).

Next, Gladney contends that Manzi's testimony in response to a question posed by

Gladney's attorney suggests that Manzi misinterpreted the ALJ's second hypothetical.  During

the testimony, the ALJ first asked Manzi a hypothetical assuming an individual retained the

capacity for light work, but was also limited to walking one hour per workday and was limited to

only frequent fingering or handling.  (Tr. 53-54).  In the second hypothetical, the ALJ asked

Manzi to assume the same limitations, but to assume that the individual only retained capacity

for sedentary (as opposed to light) work.  (Tr. 54).  Later in the testimony, Gladney's attorney

---

[3]  In addition, Gladney's attorney asked Manzi whether there would be any positions available to an individual with Gladney's RFC if the individual was limited to occasional (as opposed to frequent) fingering and handling.  Manzi testified that such an individual would be able to perform the requirements of call out operator, with 16,011 jobs nationally and 55 regionally, and surveillance systems monitor with 16,763 jobs nationally and 63 regionally.  (Tr. 57).

asked the following:  "Dr. Manzi, with hypothetical number two[,] if the Claimant was also

limited to standing one hour total in an eight-hour day, would that change your answer at all?"

(Tr. 55).  Manzi replied, "No, the total of standing and walking is two hours [and] that fits with

the DOT's definition of sedentary."  (*Id.*).  Gladney's attorney did not attempt to clarify his

question, nor did he ask Manzi to explain his answer.  Gladney now contends that Manzi's

answer suggests that when answering the ALJ's second hypothetical, Manzi ignored the ALJ's

instructions to "[a]ssume the limitations that I gave you in hypothetical number one" (which

included a one hour walking limitation) and instead provided the ALJ with an answer for a

hypothetical individual who retained the capacity to perform the full range of sedentary work,

which includes as much as two hours of walking or standing in a single workday.

Although the exchange between the attorney and Manzi is not entirely clear, the

confusion results, if not from the attorney's poorly-phrased question, from his failure to clarify

any ambiguity in Manzi's answer.  Accordingly, the ambiguity of Manzi's answer is not a proper

basis upon which to seek reversal or remand.  *See Dixson v. Colvin*, 2014 WL 1569530, *5

(D. Me. 2014).  ("to the extent that the plaintiff, who was represented at hearing, seeks reversal

and remand on the basis that [the vocational expert's] answer was incomplete or otherwise

ambiguous, her counsel could and should have sought clarification at the time") (citing *Fallon v.

Soc. Sec. Admin. Comm'r*, 2011 WL 167039, *9 (D. Me.) ("[claimant] was represented by

counsel at her hearing and the [ALJ] permitted [her] counsel to question the vocational expert[;]

[t]here is an expectation that counsel will explore these concerns with the vocational expert at the

hearing, not leave such matters to technical challenges before the courts"), *aff'd*, 2011 WL

703590 (D. Me. 2011)).  Based upon my review of the transcript, I find nothing else in the

23

transcript that suggests that Manzi did not understand the hypotheticals posed by the ALJ; this single exchange, without more, does not undermine the ALJ's findings at step five. *See Echevarria v. Astrue*, 2010 WL 21190, *5 (D. Conn. 2010) ("[t]he vocational expert was not confused[;] [i]t is inappropriate here to troll for ambiguities or to speculate how a particular question may have been misunderstood").

Finally, Gladney contends that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment that did not properly account for his Raynaud's phenomenon. Having determined that substantial evidence supports the ALJ's RFC determination, this argument is rejected. *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

### C.   <u>Credibility Determination</u>

Gladney also contends that the ALJ applied the wrong legal standard when assessing his credibility. The ALJ concluded that "the claimant's medically determinable impairments could not reasonably be expected to cause all of the alleged symptoms and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible, to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 17). According to Gladney, this credibility finding was erroneous because the ALJ found that Gladney's statements were inconsistent with his own RFC determination. (Docket # 8-1 at 11). This argument is unavailing. *See, e.g.*, *Luther v. Colvin*, 2013 WL 3816540, *7-8 (W.D.N.Y. 2013) (ALJ properly assessed plaintiff's subjective

complaints despite language in opinion that the alleged symptoms were "inconsistent with the above residual functional capacity"); *Briscoe v. Astrue*, 892 F. Supp. 2d 567, 585 (S.D.N.Y. 2012) ("[r]ead in context, however, this statement does not indicate that the RFC assessment was a basis for a finding of lack of credibility").  Here, the ALJ specifically stated that he assessed Gladney's statements concerning the intensity, persistence and limiting effects of his symptoms "[a]fter careful consideration of the evidence."  (Tr. 17).

   An ALJ's credibility assessment should contain a two-step analysis.  *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011).  First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom.  *Id.* (citing 20 C.F.R. 404.1529).  Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record."  *Id.* (citing 20 C.R.F. § 404.1529(c)).  The relevant factors for the ALJ to weigh include:  "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms."  *Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

   In his decision, after acknowledging his duty to perform the two-step analysis, the ALJ noted that he believed that Gladney honestly testified with respect to the presence of his

25

ongoing impairments in his right foot. (Tr. 17). The ALJ recognized that Gladney's two foot surgeries had not completely resolved his foot issues and that Gladney's condition continued to be monitored by a podiatrist. (*Id.*). Despite crediting portions of Gladney's testimony, the ALJ found that the opinion evidence from the consultant and Gladney's treating sources did not support Gladney's contentions that his symptoms were significant enough to render him disabled. (Tr. 18). Accordingly, the ALJ concluded that Gladney's "statements concerning the intensity, persistence and limiting effects of [his] symptoms" were not "fully credible."

Gladney contends that the ALJ's credibility determination was also flawed because the ALJ failed to articulate his basis for discounting Gladney's testimony concerning the pain he experiences in his fingers and wrists. I conclude that such error was harmless because the ALJ's rationale is evident from a review of his determination and the record evidence. *See Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) ("[w]hile it is not sufficient for the [ALJ] to make a single, conclusory statement that the claimant is not credible or simply to recite the relevant factors, . . . remand is not required where the evidence of record permits us to glean the rationale of an ALJ's decision") (internal quotations and citation omitted) (alteration in original). Although I agree with Gladney that the ALJ could have explained his determination more thoroughly, I conclude that his failure was harmless because the ALJ discussed the portions of Gladney's testimony that he credited, including his ongoing foot impairment and over-the-counter pain management, and explained that the medical evidence of record did not support a finding of any additional limitations. The cited medical evidence included Sirotenko's examination notes indicating that Gladney's hand and finger dexterity were intact, that his grip strength was 5/5 bilaterally and that he had full range of motion in his wrists. (Tr. 18 (citing

Ex. 5F)).  Thus, it is possible to glean the ALJ's rationale for discounting Gladney's testimony of

debilitating pain in his fingers and wrists – namely, that Gladney's testimony was inconsistent

with and not supported by the objective medical evidence.  Accordingly, I conclude that the

ALJ's credibility determination is supported by substantial evidence and that remand is not

required.  *See Cichocki v. Astrue*, 534 F. App'x at 76 ("[b]ecause the ALJ thoroughly explained

his credibility determination and the record evidence permits us to glean the rationale of the

ALJ's decision, the ALJ's failure to discuss those factors not relevant to his credibility

determination does not require remand").


## <u>CONCLUSION</u>

After careful review of the entire record, this Court finds that the Commissioner's

denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's

motion for judgment on the pleadings **(Docket # 7)** is **GRANTED**.  Gladney's motion for

judgment on the pleadings **(Docket # 8)** is **DENIED**, and Gladney's complaint (Docket # 1) is

dismissed with prejudice.

**IT IS SO ORDERED.**


                                                          *s/Marian W. Payson*
                                                       MARIAN W. PAYSON
                                                     United States Magistrate Judge


Dated: Rochester, New York
          July ___18___, 2014